## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**HARMONY BEHAVIORAL HEALTH
SERVICES, LLC**                                      **CIVIL ACTION**

**VERSUS**                                         **NO. 23-424-JWD-RLB**

**LOUIS KENT, CHRISSIE O'QUIN, JEFF
WILLIAMS, JEFF TRAVIS, AND EAST
FELICIANA PARISH**

### RULING AND ORDER

This matter comes before the Court on the *12(B)(1) and 12(B)(6) Motion to Dismiss* (Doc. 88) filed by Defendants Louis Kent, President of the East Feliciana Parish Police Jury ("Kent"), Christel O'Quin, Vice-President of the East Feliciana Parish Police Jury ("O'Quin"), and Jeff Williams, supervisor of the East Feliciana Building Department ("Williams"), and the East Feliciana Parish Police Jury ("EFPPJ"); and on the *12(B)(1) and 12(B)(6) Motion to Dismiss* (Doc. 90) filed by Defendant Jeff Travis, Sheriff of East Feliciana Parish ("Travis"). Plaintiff Harmony Behavioral Health Services, LLC ("Plaintiff" or "Harmony") opposes the motions. (Docs. 92, 93.) Defendants Kent, O'Quin, Williams, and EFPPJ have filed a reply. (Doc. 94.)

Plaintiff's complaint asserts claims on three main grounds. First, Plaintiff claims that Defendants have violated its Fifth Amendment rights and its rights under the Louisiana Constitution by engaging in a regulatory taking without just compensation. (Doc. 84-1 at ¶ 214.) Second, Plaintiff claims that Defendants have taken its property without the due process required by the Fourteenth Amendment, in violation of 42 U.S.C. § 1983. (*Id.* at ¶ 216.) Third, Plaintiff claims that Defendants have discriminated against it in violation of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA) due to its association with the prospective psychiatric patients. (*Id.* at ¶¶ 237–38.)

Defendants seek to dismiss all three of these counts in two separate motions to dismiss, one filed by the EFPPJ and Defendants Kent, O'Quin, and Williams (collectively, "the EFP Defendants"), and the other filed by Defendant Travis. The EFP Defendants argue first that Plaintiff's takings claim is not yet ripe and that the Court therefore lacks jurisdiction pursuant to Rule 12(b)(1). (Doc. 88-1 at 4.) Second, they argue that Plaintiff has failed to bring claims against the personal EFP Defendants in their individual capacities, that Plaintiff's claims against the personal EFP Defendants in their official capacities should be dismissed as, in effect, suits against the municipality, and that Plaintiff's § 1983 claims fail to plead sufficient facts to state a *Monell* claim against the municipality. (*Id.* at 6–8.) Third, the EFP Defendants argue that Plaintiff has failed to plead a substantive due process claim against these Defendants because it has failed to show a protected property interest or arbitrary and capricious government action. (*Id.* at 8–10.) Fourth, the EFP Defendants argue that Plaintiff has failed to establish standing for an ADA or RA claim, and that in the alternative, Plaintiff's RA claim ought to fail on the merits because Plaintiff does not show that any discrimination happened solely because of its association with a disabled person. (*Id.* at 11–13.)

Defendant Travis, like the EFP Defendants, argues that the claims against Defendant Travis are in his official capacity and are redundant with the claims against the municipality. (Doc. 90-1 at 8.) He, like the EFP Defendants, argues that Plaintiff has failed to plead sufficient facts to establish a *Monell* claim against the municipality. (*Id.*) Defendant Travis further argues that Plaintiff does not have standing to bring claims on behalf of its employees. (*Id.* at 6–7.) Defendant Travis maintains that Plaintiff's takings claim fails to allege a deprivation of all economically beneficial use of the property and therefore fails to state a claim for a regulatory taking. (*Id.* at 10.) He argues that Plaintiff has failed to state either a substantive or procedural due process claim

because it does not allege that Defendant Travis played any role in the denial of the permit. (*Id.* at 12.) Finally, like the EFP Defendants, Defendant Travis argues that Plaintiff lacks standing to sue under the ADA or RA. (*Id.*)

The Court finds that, at this motion to dismiss stage, Plaintiff has failed to allege a ripe takings claim and Defendants' motions to dismiss under 12(b)(1) are therefore GRANTED with respect to the takings claim. However, the Court finds that Plaintiff seeks to bring claims on its own behalf against not only the municipality and the personal Defendants in their official capacities, but also in their individual capacities. Defendants' motions to dismiss under 12(b)(1) for redundancy are DENIED. Plaintiff pleads facts sufficient to state a substantive due process claim against all Defendants; the motions to dismiss under 12(b)(6) are DENIED with respect to these substantive due process claims. However, Plaintiff fails to allege a procedural due process claim against Defendant Travis; Defendant Travis's motion to dismiss under 12(b)(6) is GRANTED with respect to the procedural due process claim. The Court finds that Plaintiff has standing in its own right to bring ADA and RA claims. All Defendants' motions to dismiss under 12(b)(1) for lack of standing are DENIED. Finally, the Court finds that Plaintiff pleads facts sufficient to state an RA claim against Defendants Travis, Kent, Williams, and EFPPJ, but not Defendant O'Quin; Defendants Travis, Kent, Williams, and EFPPJ's motions to dismiss under 12(b)(6) are DENIED with respect to the RA claim, and Defendant O'Quin's motion to dismiss under 12(b)(6) is GRANTED with respect to the RA claim.

## Background

It is undisputed that Plaintiff Harmony purchased the relevant Property, which included buildings and improvements previously used as a nursing home and long-term treatment center, in East Feliciana Parish on February 27, 2023. (Doc. 84-1, at ¶¶ 25, 28–33.) Plaintiff intended to use

the Property as a facility to house patients found not guilty by reason of insanity ("NGBRI") and not competent to stand trial ("NCST"). (*Id.* at ¶ 25.) Plaintiff had a Cooperative Endeavor Agreement ("CEA") with the Louisiana Department of Health ("LDH") under which it would begin to "accept patients on or before June 1, 2023." (*Id.* at ¶ 34.) Plaintiff alleges that minor renovations were required, including "replacing drop ceiling grids and tiles with solid ceilings" and "replacement of individual room sinks and fire sprinkler heads." (*Id.* at ¶ 35.) Plaintiff claims that the seller gave Plaintiff permission to begin the work approximately 12 days prior to the sale of the Property, at which point Plaintiff did not believe it needed a building permit from EFP. (*Id.* at ¶¶ 37–39.)

On February 16, 2023, soon after beginning the repairs, Plaintiff claims that Defendant Williams arrived at the Property asking for a meeting with the owner. (*Id.* at ¶ 43.) Plaintiff then attempted to apply for a permit; however, the EFP Building Department was closed on Friday, February 17, through Tuesday, February 21, 2023, due to the Department's four-day workweek, President's Day, and Mardi Gras. (*Id.* at ¶¶ 45–48.) On Wednesday, February 22, 2023, Defendant Williams allegedly posted a stop work order on the Property, ordered all employees at the Property to stop working, and stated "[y]ou don't have a permit and you're probably not going to get one." (*Id.* at ¶ 48–49.) Plaintiff alleges that beginning on February 23, 2023, Defendants Williams, O'Quin, and Travis began a pattern of surveillance of Plaintiff's Property and employees, as well as a pattern of harassment and arrests of Plaintiff's employees. (*Id.* at ¶¶ 51–55.) Plaintiff alleges that its general contractor, Collis Temple, Jr., "was on the Property supervising the removal of materials that had been demolished and securing new materials that had been delivered to the site," which Plaintiff alleges does not require a permit. (*Id.* at ¶ 50.) Plaintiff claims that Defendants O'Quin and Williams sent Defendant Travis to cite Temple for alleged violations of the EFP Code

of Ordinances, which Plaintiff argues are preempted by Louisiana state law. (*Id.* at ¶¶ 53–54, 56.) Plaintiff alleges that Defendant Travis had previously publicly stated "I'm going to do everything I can to see that this project doesn't happen!" (*Id.* at ¶ 55.)

Plaintiff alleges that Defendants Williams and O'Quin continued to surveil the property throughout the month of February. (*Id.* at ¶ 62.) It claims that on March 6, 2023, Defendant Williams informed the EFPPJ that the Parish did not have a zoning administrator but that he recommended that the EFPPJ require the Property be rezoned due to his belief that it would be an "institution." (*Id.* at ¶ 67.) Plaintiff alleges that Defendant Williams stated to the EFPPJ that he would not issue any permits for the Property until "all this is clarified." (*Id.* at ¶ 68.) It claims that at the same meeting, Defendant Travis stated that he was "not in support" of the project "as the sheriff of the East Feliciana Parish" and that he was "going to do everything [he] can to see that this doesn't happen." (*Id.* at ¶ 70–71.) Plaintiff alleges that Defendant Kent "opined that no facility to house mentally disabled individuals could be renovated until the Property was rezoned." (*Id.* at ¶ 93.)

Plaintiff states that on March 9, 2023, it submitted renovation plans to the State Fire Marshal, which issued a Plan Review Report recommending "tentative license approval pending acceptance of noted comments and final onsite inspection" by the Louisiana Department of Health. (*Id.* at ¶ 73.) Plaintiff alleges that it submitted identical plans to the EFP Building Department, along with an application for a permit. (*Id.* at ¶ 74.) Plaintiff claims that Defendant Williams contacted the State Fire Marshal to set up a March 13, 2023, inspection prior to issuing a permit, which Plaintiff alleges was "highly unusual and suggests that Williams and O'Quin wanted to attempt to influence the decision of the State Fire Marshal's office." (*Id.* at ¶¶ 75, 77.) Plaintiff alleges that Defendant Williams accompanied the Fire Marshal's inspection without authorization

5

to be on the Property in an attempt to influence the outcome of the inspection. (*Id.* at ¶¶ 82–85.) Despite this, Plaintiff states that the Fire Marshal found no deficiencies. (*Id.* at ¶ 87.)

Plaintiff alleges that despite its inquiries, as of March 14, 2023, Defendant Williams informed Plaintiff that "he could not issue the permit without direction from the EFP Police Jury" and recommended that Plaintiff's representative attend the March 20, 2023, EFPPJ meeting "to 'expedite this process.'" (*Id.* at ¶ 96.) Plaintiff asserts that this was a denial of the permit. (*Id.* at ¶¶ 96–97.)

Plaintiff alleges that on March 23, 2023, Defendant Williams again denied the permit request without providing any reasons for the denial. (*Id.* at ¶¶ 100–01.) On March 23, 2023, Plaintiff filed suit in the 20th Judicial District Court for a Writ of Mandamus, seeking issuance of the building permit. (*Id.* at ¶ 102.) On April 4, 2023, the state court held a hearing on this application, the result of which was a ruling "that Harmony's request was premature 'based upon a finding that there was never a denial of the permit application.'" (*Id.* at ¶ 125.)

Plaintiff claims that on March 28, 2023, a surveyor hired by the seller of the Property appeared at the EFP Planning and Zoning Commission to obtain approval for a re-platting of 1.52 acres of the Property that was to be transferred from Plaintiff to the seller. (*Id.* at ¶¶ 105–08.) However, the EFP Planning and Zoning Commission refused to approve the plat without the engineer placing a note on the tract that the Property should be zoned A-2; Plaintiff argues that the Property is un-zoned. (*Id.* at ¶¶ 109–10, 124.) Plaintiff also alleges that the EFP Planning and Zoning Commission added an agenda item "clarifying" that the Property was zoned A-2, without any notice to Plaintiff. (*Id.* at ¶ 110.) Plaintiff states that the surveyor "has not resubmitted the plat with any note additions demanded by the EFP Planning and Zoning Commission." (*Id.* at ¶ 112.)

Plaintiff claims that on two later occasions, contractors or employees attempted to do work on the Property, either accidentally or in the belief that such work was not prohibited by the stop work order. (*Id.* at ¶¶ 126–28, 137–38.) In each case, following surveillance by Defendant Williams, Defendant Travis issued citations to Plaintiff's employees and threatened them with arrest. (*Id.* at ¶¶ 129–32, 139–50.)

Plaintiff claims that the Louisiana Department of Health, recognizing that the CEA may not be fulfilled due to the delays in the work, suggested an alternative plan whereby a state-owned facility would house the NGBRI and NCST patients and the Property would house the geriatric patients formerly housed at the state-owned facility. (*Id.* at ¶ 157.) Plaintiff alleges that it joined in a Letter of Intent to that effect with the State. (*Id.* at ¶ 158.) However, at a public information meeting organized by Defendant Kent, parish representatives and residents continued to object to any patients being housed at the Property. (*Id.* at ¶ 165.)

On May 15, 2023, sixty-seven days after Plaintiff's permit application was submitted, Plaintiff's counsel sent a letter to the EFPPJ again seeking the permit. (*Id.* at ¶ 166–67.) Plaintiff received a response alleging seven deficiencies, all of which Plaintiff refutes. (*Id.* at ¶¶ 168–69.) First and foremost, Plaintiff alleges that the denial stated that the Property is zoned as A-2 and must be C-2 for a nursing home. (*Id.* at ¶ 168.) Plaintiff responded to the EFP District Attorney disputing each of these alleged deficiencies. (*Id.* at ¶ 169.) Plaintiff claims that after it remedied all alleged deficiencies with the exception of the zoning dispute, Defendant Williams still refused to issue a permit due to the lack of zoning and stated that "that building can't be used for a whole heck of a lot of things." (*Id.* at ¶ 194–96.)

Plaintiff states that on September 13, 2023, the LDH terminated the CEA. (*Id.* at ¶ 240.) As a result, it alleges it has incurred damages upwards of $1.6 million due to loss of property, with

an additional $4.5 million for the loss of renovation costs, and over $102 million due to loss of income. (*Id.* at ¶¶ 217–18.)

Plaintiff alleges that all of Defendants' actions were taken in an attempt to prevent NGBRI and NCST patients from being housed in East Feliciana Parish. (*Id.* at ¶ 212.)

## Procedural Background

Plaintiff first brought this action on June 2, 2023. (Doc. 1.) Plaintiff has since amended its complaint multiple times, culminating in this *Fourth Amended and Supplemental Complaint* (Doc. 84). (Docs. 8, 17, 81, 84.) Plaintiff filed a *Motion for a Preliminary Injunction and/or Motion for Partial Summary Judgment* (Doc. 26) on August 21, 2023, which Defendants opposed (Docs. 46, 76). This was denied without prejudice following the filing of Plaintiff's amended complaint (Doc. 82). (Doc. 83.) Defendant Travis filed a *12(B)(6) Motion to Dismiss* (Doc. 47) and Defendants EFPPJ, Kent, O'Quin, and Williams filed a *12(B)(1) and 12(B)(6) Motion to Dismiss* (Doc. 53), which were likewise denied without prejudice following the filing of Plaintiff's *Fourth Amended and Supplemental Complaint* (Doc. 82, *superseded by* Doc. 84). (Doc. 83.) The EFP Defendants and Travis now file the instant motions to dismiss (Docs. 88, 90), which Plaintiff opposes (Docs. 92, 93), and for which the EFP Defendants submit a reply memorandum (Doc. 94).

## Applicable Standards

### I.    12(b)(1) Standard

Rule 12(b)(1) permits a party to raise the defense of lack of subject matter jurisdiction at any time. Fed. R. Civ. P. 12(b)(1), 12(h)(3). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286

(5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006,

1010 (5th Cir. 1998)). The Fifth Circuit articulated the 12(b)(1) standard as follows:

> Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996).
>
> The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995). Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam).
> . . .
> In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief. *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998).

*Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

A Rule 12(b)(1) challenge to subject matter jurisdiction may be either a "facial" or "factual"

attack. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). A facial attack is

"unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on

the pleadings." *Harmouche v. Consulate General of the State of Qatar*, 313 F. Supp. 3d 815, 819

(S.D. Tex. 2018) (citing *Paterson*, 644 F.2d at 523). Facial attacks require the court to look only

"to the sufficiency of the allegations in the complaint because they are presumed to be true. If those

jurisdictional allegations are sufficient the complaint stands." *Paterson*, 644 F.2d at 523.

On the other hand, "[a] factual attack challenges the existence of subject matter jurisdiction

in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and

affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* In the case of a factual attack, the plaintiff must "submit facts through some evidentiary method and …prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

## II.    12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dall. Cnty.*, 79 F.4th 494, 499 (5th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). The Court does "not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (citing *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir.2010) (citing *Iqbal*, 556 U.S. at 678)). "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].'" *Calhoun v. City of Houston Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

Additionally, "[i]n determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted). "Although a 'court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' . . . the court need not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)). *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (using permissive language regarding a court's ability to rely on documents incorporated into the complaint by reference).

11

**Discussion**

I.    **Plaintiff Brings Suit Against the Personal Defendants in Both Their Individual and Official Capacities**

As a preliminary matter, Defendants raise the issue of whether Travis, Kent, O'Quin, and Williams are sued in their individual or personal capacities. (Doc. 88-1 at 7–8; Doc. 90-1 at 8.) Defendants argue that all four are sued in their official rather than individual capacities, making those claims redundant with the claims against the government entity, here the EFPPJ. (Doc. 88-1 at 7–8; Doc. 90-1 at 8.) Plaintiff argues that it has, in fact, brought claims against all four in their individual as well as official capacities, but that they have only been represented by counsel in their official capacities. (Doc. 92 at 8–10; Doc. 93 at 17.)

It is well-established that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). However, the Fifth Circuit has explicitly stated that "[a] person's capacity need not be pled except to the extent required to show the jurisdiction of the court." *Robinson v. Hunt Cty.*, 921 F.3d 440, 446 (5th Cir. 2019) (quoting *Parker v. Graves*, 470 F.2d 335, 336 (5th Cir. 1973) (per curiam)). "To determine whether a defendant is being sued in his or her official or individual capacity," the Court "examine[s] 'the allegations in the complaint' and 'the course of the proceedings.'" *Id.* at 446–47 (upholding the district court's dismissal of § 1983 claims against individual defendants where the plaintiff explicitly sought injunctive and declaratory relief from defendants in their official capacities but monetary damages from defendants in their individual capacities) (quoting *Graham*, 473 U.S. at 167 n.14.). *See Dougherty v. United States Dep't of Homeland Sec.*, No. 22-40665, 2023 U.S. App. LEXIS 24807 at *4 n.1, 2023 WL 6123106 at 2 n.1 (5th Cir. Sep. 19, 2023) (unpublished) (relying on later briefing to clarify whether the plaintiff intended to sue defendants in their individual or official capacities).

12

Here, Plaintiff's complaint does not specify whether Defendants Kent, O'Quin, Williams, and Travis are sued in their official or individual capacities. *See* (Doc. 84-1 at ¶¶ 1–5.) Plaintiff does state that the actions taken by each individual Defendant "were made in their official capacities" or "capacity as an employee of EFP," arguing that EFPPJ should be held liable under *respondeat superior*. (Doc. 84-1 at ¶¶ 204–07.) There is no *respondeat superior* under § 1983, under which Plaintiff brings suit. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). However, the doctrine of *respondeat superior* is an attempt to hold an employer accountable for the wrongdoings of an employee, indicating that Plaintiff is alleging individual wrongdoings on the part of each individual Defendant. The substance of the complaint and subsequent pleadings indicate likewise. Plaintiff alleges individual wrongdoing on the part of each personal Defendant. The Court will therefore analyze whether Plaintiff alleges facts sufficient to state a claim against each Defendant.

## II.    Plaintiff's Takings Claim Is Not Ripe

"Ripeness is part of subject matter jurisdiction, which must be established by the party invoking federal jurisdiction." *Donelon v. Altman*, No. 20-604, 2021 U.S. Dist. LEXIS 175606, 2021 WL 4205654, at *3 (M.D. La. Sept. 15, 2021) (Dick, C.J.). Justiciability requires ripeness, which means that a case is "not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). "A case becomes ripe when it 'would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now.'" *Donelon*, 2021 WL 4205654, at *3 (citing *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010)).

With respect to regulatory takings, a case becomes ripe for review when "(1) the relevant governmental unit has reached a final decision as to how the regulation will be applied to the landowner, and (2) the plaintiff has sought compensation for the alleged taking through whatever adequate procedures the state provides." *Severance v. Patterson*, 566 F.3d 490, 496 (5th Cir. 2009) (citing *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985) (*overruled in part by Knick v. Twp. of Scott*, 588 U.S. 180 (2019) (holding that exhaustion through state litigation is not necessary prior to a § 1983 suit for a Fifth Amendment takings claim)).

The Fifth Amendment's Takings Clause "provides that private property shall not be 'taken for public use without just compensation.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) (quoting U.S. Const. amend. V). It "does not prohibit the taking of private property, but instead places a condition on the exercise of that power. . . . It is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id.* at 537 (quoting *First Eng. Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314–15 (1987)) (emphasis in original). The Supreme Court has explained that when a government regulation goes too far, it constitutes a regulatory taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). The Supreme Court has not, however, prescribed a "set formula" to determine what is "too far". It instead engages in fact-specific inquiries, looking at factors such as the economic impact on the claimant, the interference of the regulation with investment-backed expectations, and the character of the government action. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124-25 (1978). Courts also look at the nature of the government interference with the property, considering whether it serves "to promote the common good." *Id.* at 124. The validity of the government's actions "depends largely 'upon the particular circumstances in that case.'" *Id.* at 124

14

(quoting *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168 (1958); citing *United States v. Caltex, Inc.*, 344 U.S. 149, 156 (1952)).

In cases where the regulations deny "all economically beneficial or productive use of land," the Supreme Court does not require a "case-specific inquiry into the public interest advanced in support of the restraint." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992). Where the "owner is not deprived of *all* economic benefit, the owner would not be able to recover automatically" but would instead be subject to a *Penn Central* analysis "to determine the extent of [the plaintiff's] loss." *Robinson v. City of Baton Rouge*, No. 13-375, 2015 U.S. Dist. LEXIS 192595 at *19–20, 2015 WL 13522820 at *8 (M.D. La. Mar. 20, 2015) (deGravelles, J.) (citing *Lucas*, 505 U.S. at 1019 n.8).

Defendants Kent, O'Quin, Williams, and EFPPJ argue that Plaintiff's takings claim is not yet ripe for judicial review. (Doc. 88-1 at 4.) They argue that the takings claim will become ripe only when there is a final decision, rather than due to normal delays in obtaining the permit. (*Id.*) Defendants claim that Plaintiff only "submitted a permit application for a psychiatric hospital, that was denied for deficiencies." (*Id.* at 5.) Plaintiff argues that this, along with Defendant Williams' second denial pending "zoning" was the final decision allowing the action before the Court. (Doc. 84-1 at ¶ 168, 195.) Defendants, on the other hand, claims that Plaintiff now seeks a new building permit "that allows for the renovation to operate a nursing home facility" without having ever applied for such a permit. (Doc. 88-1 at 5.) Plaintiff disputes this, saying that the matter at hand is the wrongful denial of the building permit for the psychiatric hospital, which led to the termination of the CEA. (Doc. 92 at 7.) Simply put, Defendant alleges that this suit seeks a permit for a nursing home; Plaintiff alleges that this suit seeks damages for the denial of the permit for a psychiatric hospital. (*Id.*) Plaintiff states that while it initially sought injunctive relief ordering EFP to issue a

permit for the psychiatric hospital, the CEA has now been terminated, and Plaintiff seeks damages for the economic harms caused by that termination. (*Id.*)

The question of whether Plaintiff seeks a permit for the nursing home, a permit for the psychiatric hospital, or damages is a facial challenge. Looking to Plaintiff's pleadings, it is clear that Plaintiff seeks both a building permit for the psychiatric hospital and damages. (Doc. 84-1 at ¶ 246; Doc. 92 at 7.) Plaintiff does not allege that it has applied for a permit for a nursing home. (Doc. 92 at 7.)

Defendants also argue that Plaintiff's application for a building permit—even for the psychiatric hospital—has not yet received a final decision and is therefore not ripe. (Doc. 88-1 at 4.) They argue that there must be a conclusive determination that Plaintiff will be denied all reasonable beneficial use of its property and that Plaintiff must not have "ignored or abandoned some relevant form of review or relief." (Doc. 88-1 at 4–5) (quoting *Urban Devs. LLC. V. City of Jackson*, 468 F.3d 281, 293 (5th Cir. 2006)). Plaintiff addresses this 12(b)(1) ripeness challenge as a factual challenge to the subject matter jurisdiction. (Doc. 92 at 3–4; Doc. 59 at 3.) Plaintiff argues that it applied for a permit, which was repeatedly denied (Doc. 84-1 at ¶¶ 96–97, 100–01, 194–96); that it was told prior to the application that it would not get a permit (*Id.* at ¶ 48); that it remedied any alleged deficiencies in the permit application, with the exception of the disputed zoning status (*Id.* at 168–69); and that it had no way to appeal the permit denial. (Doc. 92 at 7.) As a result, Plaintiff argues, the permit denial was a final decision.

In *Bienville Quarters, LLC v. East Feliciana Parish*, this District found that the case was not yet ripe because the plaintiff "ha[d] not applied to Parish authorities for any sort of building permit" and "the Parish ha[d] not taken any action to estop this particular plaintiff from developing its property." *Bienville Quarters*, No. 07-158-JJB-DLD, 2008 U.S. Dist. LEXIS 139555 at *7,

2008 WL 11417455 at *3 (M.D. La. Feb. 8, 2008) (Brady, J.). In contrast, Plaintiff here has applied for a permit and complied with any further demands by Defendants, with the exception of the disputed zoning requirement. (Doc. 84-1 at ¶¶ 168–69, 185–202.)

Plaintiff and Defendants dispute the zoning status of the Property, with Plaintiff arguing that it was unzoned or, in the alternative, that Plaintiff's proposed use was grandfathered in. (Doc. 92 at 6; Doc. 84-1 at ¶¶ 199–202.) Defendants, on the other hand, argue that the Property was improperly zoned, which they claim led to the denial of Plaintiff's permit application. (Doc. 88-1 at 5.) Plaintiff presents affidavits attesting to the lack of zoning restrictions and to Defendants' refusal to issue a building permit regardless. (Doc. 59-2 at ¶ 10(j).) It alleges that the permit denial happened after it attempted to address alleged deficiencies in its permit application, which it argues are not legal barriers to the permit. (Doc. 84-1 at ¶¶ 168–69, 195.) Plaintiff argues that Defendant Williams' refusal to grant a permit unless Plaintiff rezoned was, in fact, a final decision. (Doc. 92 at 6.) Plaintiff further alleges that there is no avenue for appeal of such a decision. (*Id.* at 7) At this stage, the Court accepts Plaintiff's factual allegations. However, Plaintiff's repeated requests for a permit are not automatically an appeal or a request for rehearing, nor does Plaintiff allege them to be.

In cases over zoning disputes, courts have typically required plaintiffs to seek administrative relief such as a variance or a waiver prior to a decision being considered final. In cases about permitting disputes, a plaintiff must make a meaningful application and pursue appeals processes provided by the state or municipality. *Urban Devs.*, 468 F.3d at 293. The EFP Municipal Code allows "appeals where it is alleged by the applicant that there is an error in any order, requirement, permit, decision, determination, or refusal made by the commission or other administrative/building official." East Feliciana Parish Ordinances, ch. 1, art. 1, §§ 3B-67(b)(1)(a).

The statute provides a process for such an appeal, including that the application for appeal must be filed by the fifteenth of a month for consideration at the next commission meeting, followed by a public hearing. Sec. 3B-67(b)(5). It also provides for rehearing. *Id.* Looking to the pleadings and the affidavits, Plaintiff fails to allege a final decision and show ripeness. Regardless of the zoning dispute, Plaintiff fails to allege a final decision with respect to the permit and therefore fails to show ripeness on the takings claim. Defendants' motions to dismiss are granted with respect to the takings claim.

### III.    Plaintiff's § 1983 Claims

A § 1983 claim requires a deprivation of a right protected by the Constitution or federal law by someone acting under color of state law. 42 U.S.C. § 1983. Here, Plaintiff alleges its Fourteenth Amendment due process rights have been violated by the EFPPJ Defendants. (Doc. 84-1 at ¶ 216.) "In a section 1983 cause of action asserting a due process violation, a plaintiff must first identify a life, liberty, or property interest protected by the Fourteenth Amendment and then identify a state action that resulted in a deprivation of that interest." *Blackburn v. City of Marshall*, 42 F.3d 925, 935 (5th Cir. 1995). As the Fifth Circuit has stated:

> In order for a person to have a property interest within the ambit of the Fourteenth Amendment, he "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Property interests are not created by the Constitution; rather, they stem from independent sources such as state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings. *Perry v. Sindermann*, 408 U.S. 593, 599-601, 92 S. Ct. 2694, 2699-700 (1972). However, it is clear that "the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood*, 426 U.S. 341, 344, 96 S. Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (footnote omitted).

*Id.* at 936–37 (citation omitted). Furthermore, "[a]lthough the underlying substantive interest is created by 'an independent source such as state law,' *federal constitutional law*

determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 757 (2005) (emphasis in original). The Supreme Court has recognized that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Id.* at 756. Louisiana recognizes that a landowner's interest in the economic and business pursuits in his land as "clearly one of the rights which flows from property ownership." *State, Dep't of Transp. & Dev. v. Exxon Corp.*, 430 So. 2d 1191, 1195 (La. Ct. App. 1983).

In *Robinson v. City of Baton Rouge*, the Court found that an entitlement required a "'certainty or a very strong likelihood'" that the application would be granted with a "'focus primarily on the degree of discretion enjoyed by the issuing authority, not the estimated probability that the authority will act favorably in a particular case.'" No. 13-375-JWD-RLB, 2016 U.S. Dist. LEXIS 146461 at *55 (M.D. La. Oct. 22, 2016) (deGravelles, J.) (quoting *Homeowner/Contractor Consultants, Inc. v. Ascension Par. Plan. & Zoning Comm'n*, 32 F. Supp. 2d 384, 392 (M.D. La. 1999)). Even where the municipality has discretion, it must not be "exercised arbitrarily and capriciously." *Id.* at *65 (quoting *GBT Realty Corp. v. City of Shreveport*, 50, 104, 180 So. 3d 458 (La. Ct. App. 2015)). In order for such a decision to be unconstitutional, it must be "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926). With respect to permits, the Supreme Court has held that "[i]f the government can deny a building permit to further a 'legitimate police-power purpose,' then it can also place conditions on the permit that serve the same end." *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 274 (2024). However, this "bargain takes on a different character when the government withholds or conditions a building permit for reasons unrelated to its land-use interests." *Id.* at 275.

Plaintiff asserts a § 1983 claim against Defendants, alleging it was deprived of "due process and equal protection under the US and Louisiana Constitutions." (Doc. 84-1 at ¶ 114.) It brings these claims against the East Feliciana Parish Police Jury, against Defendant Kent as a member and President of the EFPPJ, against Defendant O'Quin as a member and Vice-President of the EFPPJ, against Defendant Travis as the Sheriff of East Feliciana Parish, and against Defendant Williams as an EFP employee supervising the Building Department. (Doc. 84-1 at ¶¶ 1–5.)

### a. Plaintiff Pleads Sufficient Facts to State a *Monell* Claim

Under § 1983, municipal liability requires showing (1) a policymaker; (2) an official policy; and (3) "a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't. of Social Servs.*, 436 U.S. 658, 694 (1978)).

In East Feliciana Parish, the Police Jury is the governing body that passes bills and ordinances. East Feliciana Parish Ordinances ch. 1, art. 1, §§ 1, 2; La. Rev. Stat. Ann. §§ 33:1221, 1226, 1236. It is, therefore, the parish policymaker.

An official policy "may include 'duly promulgated policy statements, ordinances or regulations,' or 'a persistent, widespread practice of [municipal] officials or employees, which… is so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Ford v. Anderson Cnty.*, 102 F.4th 292, 322 (5th Cir. 2024) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)). Defendant argues that Plaintiff fails to show either an official policy or a "pattern of similar violations." (Doc. 88-1 at 7) (quoting *Romero v. Brown*, 937 F.3d 514, 523 (5th Cir. 2019)). Plaintiff argues that there was, in fact, a parish policy of discrimination. (Doc. 92 at 9.) In support, Plaintiff presents the statement of Defendant Kent, the EFPPJ President, at the May 10, 2023, public meeting, that "the kind of people that [Plaintiff] wants to put in Grace

20

will never happen in the Parish." (*Id.* at 14.) Plaintiff also presents statements by Defendants Travis and Williams that it alleges were discriminatory. (Doc. 84-1 at ¶¶ 67, 70–71, 93–94, 162, 165.) Plaintiff alleges further that the EFPPJ had a policy requiring it to unnecessarily rezone prior to obtaining a building permit, which was stated by numerous Parish officials—by Defendant O'Quin to Defendant Williams prior to the March 6, 2023, police jury meeting (*Id.* at ¶¶ 62–65); by Defendant Williams, at the March 6 public meeting (*Id.* at ¶ 67–68); by Defendant Kent, at the same meeting (*Id.* at ¶ 93); in response to Plaintiff's permit application, on May 15 (*Id.* at ¶ 168); and by Defendant Williams to Plaintiff following Plaintiff's attempt to remedy any permit deficiencies. (*Id.* at ¶ 195.) Plaintiff alleges that this policy caused a deprivation of Plaintiff's property rights absent due process. (*Id.* at ¶ 216.)

### a. Plaintiff States a Claim for a Substantive Due Process Violation

The Fifth Circuit has stated that "[a] violation of substantive due process… occurs only when the government deprives someone of liberty or property." *Simi Inv. Co. v. Harris Cnty.*, 236 F.3d 240, 249 (5th Cir. 2000) (quoting *Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988)). In land regulation cases, a substantive due process violation occurs "in situations where the governmental decision in question impinges upon a landowner's use and enjoyment of property" and the "land-owning plaintiff… alleges that the decision limiting the intended land use was arbitrary or capricious." *Id.* (quoting *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 601 (3d Cir. 1995)).

Here, Plaintiff claims that it applied for a permit, complied with all applicable laws, and conformed to additional demands from the government Defendants. (Doc. 84-1 at ¶¶ 169–203.) It alleges that Defendants' denial of the permit, absent any ongoing deficiencies, is arbitrary and capricious. (Doc. 84-1 at ¶¶ 101, 215–16, 220.) Defendants dispute whether Plaintiff has, in fact,

complied with all applicable laws given the zoning dispute. (Doc. 88-1 at 5.) At this motion to dismiss stage, and in light of Plaintiff's affidavits as to the zoning regulations, the Court accepts Plaintiff's assertion that it has complied with all applicable laws. It also accepts Plaintiff's allegations as to Defendants' statements, which Plaintiff claims are evidence of discrimination. Plaintiff points to Defendant Williams' statement—prior to any permit application—that "[y]ou don't have a permit and you're probably not going to get one" and that the Property would be "an institution." (Doc. 84-1 at ¶¶ 48, 67.) Plaintiff further points to Defendants Travis' statements that he was "going to do everything [he] can to see that this project doesn't happen," that he was "not in support of it… as the sheriff of the East Feliciana Parish," and that he was "not for it and [he was] going to do everything [he] can to see that this doesn't happen." (*Id.* at ¶¶ 55, 70–71.) Plaintiff also points to Defendant Kent's statement that "the kind of people that [Plaintiff] wants to put in Grace will never happen in the Parish." (*Id.* at ¶ 165.) Plaintiff further alleges that the prior owner of the Property was permitted to use the property as a nursing home with the existing zoning, while Plaintiff was informed that the Property would have to be rezoned for use as a facility for NGBRI and NCST patients. (Doc. 84-1 at ¶¶ 185–89, 196–202.) Plaintiff claims that there is no legal basis for such a requirement. (*Id.* at ¶¶ 199–202.) Plaintiff argues that these statements and disparate treatment reveal Defendants' discriminatory intent in denying the permit application. (*Id.* at ¶¶ 72, 103.)

The "bare desire to harm a politically unpopular group" is not considered a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (quoting *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 535 (1973) (finding that a city's requirement that a home for the mentally disabled obtain a special use permit, unlike other similarly situated buildings, was unconstitutional). *See Adolph v. Fed. Emergency Mgmt. Agency*, 854 F.2d 732, 740

(5th Cir. 1988) (finding that a parish's building code did not violate the Fifth or Fourteenth Amendments where it "protects the public health and substantial non-complying, but non-injurious uses are permitted" and where "there are also *no indications of arbitrary, discriminatory, or acquisitive governmental conduct*") (emphasis added). The Fifth Circuit has previously described a case where a "jury could reasonably find a discriminatory application" as one "which lacked a rational basis." *Jackson Ct. Condos., Inc. v. New Orleans*, 874 F.2d 1070, 1079 (5th Cir. 1989) (discussing *Bennett v. Slidell*, 697 F.2d 657 (5th Cir. 1983) (finding discriminatory intent and no rational basis where the city delayed granting the routinely issued occupancy permit following complaints from the plaintiff's influential neighbor) (*rev'd in part on other grounds*, 728 F.2d 762 (5th Cir. 1984) (en banc), *cert. denied*, 472 U.S. 1016 (1985)).

Plaintiff sufficiently alleges that the permit denial was arbitrary and capricious, rooted in discrimination towards the mentally disabled rather than any conceivable rational basis. Plaintiff alleges that Defendants Williams, Kent, and O'Quin each played a role in this denial in their roles as EFPPJ members and in their individual capacities. It alleges that Defendant Williams acted as a Parish Building Official although he was not, in fact, legally appointed as such (Doc. 84-1 at ¶¶ 41–42, 58, 67, 134, 191–92); that he took actions to stop Plaintiff's work on the Property without proper legal authority (*id.* at ¶¶ 43, 48–49, 54, 56, 59, 75, 126–34, 138–41, 149, 192); that he described the Property as an "institution" requiring "rezon[ing] … to industrial" (*id.* at ¶ 67); that he attempted to influence the State Fire Marshal's property inspection (*id.* at ¶¶ 73–89); that he "personally assured the EFP Police Jury that the Building Department would not issue a permit to Harmony" (*id.* at ¶ 94); that he refused to take action on Plaintiff's permit application for over two months (*id.* at ¶ 166); and that he then played a role in denying the permit for deficiencies that Plaintiff alleges are pretextual (*id.* at ¶¶ 92–101, 125, 170, 194-97, 202–03, 205; Doc. 92 at 4-5).

In addition, Plaintiff alleges that Defendant O'Quin worked with Defendant Williams to unlawfully act as the EFP Building Official (*id.* at ¶¶ 63–65, 192); that she surveilled the Property in order to enforce the cease and desist that Plaintiff alleges was unlawful (*id.* at ¶¶ 51–53, 60–62, 76, 80, 91); that she attempted to influence the State Fire Marshal's inspection of the Property (*id.* at ¶ 77–79, 89–90); that she used her role on the EFPPJ to improperly influence public opinion about the Property (*id.* at 103–04); and that she attempted to delay any Property renovations (*id.*, *id.* at ¶ 203). Plaintiff alleges that Defendant Kent expressed to the EFPPJ that a "facility to house mentally disabled individuals" would need to be rezoned prior to any renovations (*id.* at ¶ 93); and that he expressed publicly that "the kind of people that [Plaintiff] wants to put in Grace will never happen in the Parish." (*id.* at ¶ 165.) Plaintiff further alleges that Defendant Travis stated "that it would be wonderful if inmates of the forensic facility [NGBRI and NCST patients] would not be in a residential area" (*id.* at ¶ 162); that he "publicly stated 'I'm going to do everything I can to see that this project doesn't happen'" (*id.* at ¶ 55); that he stated he was not in support of the project in his role as sheriff (*id.* at ¶¶ 70, 71); that he and his department issued citations to Plaintiff's employees absent a valid ordinance (*id.* at ¶¶ 54, 56, 129, 155; that he contacted the state district judge in an attempt to enforce the cease and desist that Plaintiff alleges was unlawful (*id.* at ¶¶ 142–44); that he used his position as Sheriff to give media sources what Plaintiff claims was incorrect information about the Property (*id.* at ¶¶ 152–54); and that he used his position as Sheriff to deny Plaintiff the use of the Property. (*id.* at ¶ 211.) Plaintiff adequately alleges a substantive due process claim against each individual Defendant at this motion to dismiss stage.

### b.  Plaintiff Does Not State a Procedural Due Process Claim

Defendants EFPPJ, Kent, O'Quin, and Williams do not seek to dismiss any procedural due process claims. Defendant Travis maintains that Plaintiff has not adequately stated a procedural

due process claim because, he argues, "Plaintiff has not alleged that the Sheriff has a role in consideration of, issuance of, or denial of the permit." (Doc. 90-1 at 12.) Plaintiff does not allege that Defendant Travis plays a role in the permitting process. (Doc. 84-1 at ¶¶ 4, 101–03, 166–68.) Instead, it alleges that Defendant Travis worked to enforce an EFP policy to prevent the project from going forward by enforcing the cease-and-desist order absent legitimate basis. (*Id.* at ¶¶ 54–57, 70–72, 142–43, 152–54, 162–63.) Plaintiff alleges that it did not receive a public hearing for the stop work order. (Doc. 84-1 at ¶ 114.) However, Plaintiff does not allege that it at any point requested a public hearing for the stop work order. It further alleges—stating a *Monell* claim against the Parish—that Defendant Travis was a policymaker who stated an official policy of preventing the Property's development and then carried out this policy by harassing Plaintiff's employees. (Doc. 93 at 3–5.)

The Supreme Court has "described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). In the stop work order context, "courts have found due process protections satisfied where a hearing was not held until after the issuance of such an order." *Petroplex Int'l, LLC v. St. James Par.*, No. 15-140, 2015 U.S. Dist. LEXIS 141757 at *25 (E.D. La. Oct. 19, 2015) (citing *3883 Conn., LLC v. District of Columbia*, 336 F.3d 1068, 1074 (D.C. Cir. 2003)). However, the Fifth Circuit has repeatedly held that "one who fails to take advantage of procedural safeguards available to him cannot later claim he was denied due process." *Browning v. Odessa*, 990 F.2d 842, 845 n.7 (5th Cir. 1993) (citing *Rathjen v. Litchfield*, 878 F.2d 836, 839 (5th Cir. 1989); *Galloway v. State of Louisiana*, 817 F.2d 1154, 1158 (5th Cir. 1987)). Since Plaintiff failed to request a hearing for the stop work order, even after the order was

25

issued, Plaintiff has failed to state a procedural due process claim with respect to the stop work order. Defendant Travis's motion to dismiss pursuant to Rule 12(b)(6) is granted with respect to the procedural due process claim.

### c. Plaintiff States an ADA and RA Claim

#### i. Plaintiff Has Standing to Bring an ADA and RA Claim

Defendants Travis, Kent, O'Quin, Williams, and EFPPJ all argue that Plaintiff lacks standing to sue under the ADA and RA. (Doc. 88-1 at 12; Doc. 90-1 at 12.) They argue first that Plaintiff is not a qualifying disabled individual as defined under the ADA or RA and is therefore unable to bring a direct claim under either statute. (Doc. 88-1 at 12; Doc. 90-1 at 14.) Second, they argue that Congress has not authorized third-party standing under either the ADA or RA, with the exception of specified entities such as the EEOC. (Doc. 88-1 at 12; Doc. 90-1 at 14.) Plaintiff is not, according to Defendants, a third party authorized to bring an action on behalf of the NGBRI and NCST patients. (Doc. 88-1 at 12; Doc. 90-1 at 14.) Plaintiff sues under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and under the Rehabilitation Act ("RA") 29 U.S.C. § 794, *et seq.*, alleging it "possesses a cause of action based on associational discrimination" allowing it to sue "on its own behalf for injury it suffers itself due to its association with ADA-protected persons (NGBRI and NCST patients)." (Doc. 84-1 at ¶ 237.)

"The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (citing *Delano-Pyle v. Victoria Cnty, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002)). In the Fifth Circuit, the standard "to establish a prima facie case under either statute" requires that the plaintiff show:

> (1) that he is a qualified individual . . .; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against

by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023). In assessing causation, the RA "requires that the plaintiff's disability be the 'sole reason' for the exclusion or denial of benefits" while "the ADA's standard is less stringent." *Id.* (citing *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005)). A plaintiff must show intentional discrimination to recover damages under either the ADA or the RA. *Id.* (citing *Delano-Pyle*, 302 F.3d at 574). The Fifth Circuit has "not 'delineated the precise contours of this intentionality requirement'" but its "'cases to have touched on the issue require something more than deliberate indifference.'" *Id.* at 449-50 (quoting *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020)). If a discriminatory motive is shown, then the intentionality requirement is met. *Id.* (quoting *Wilson v. City of Southlake*, No. 21-10771, 2022 U.S. App. LEXIS 34333, 2022 WL 17604575, at *6 (5th Cir. Dec. 13, 2022) (per curiam)).

With respect to associational standing, the Eastern District of Louisiana has outlined the differences between the ADA and the RA, the latter of which has been interpreted differently by different circuits. *Bernius v. Ochsner Med. Ctr. - N. Shore, L.L.C.*, No. 16-14730, 2016 U.S. Dist. LEXIS 189428 (E.D. La. Dec. 15, 2016) (Barbier, J.). Its reasoning and approach have been followed by other district courts in the Fifth Circuit. *See Labouliere v. Our Lady of the Lake Found.*, No. 16-00785-JJB-EWD, 2017 U.S. Dist. LEXIS 160853 (M.D. La. Sep. 29, 2017) (Brady, J.); *Brown v. McLane Child.'s Scott*, No. W-19-CV-00045-ADA, 2018 U.S. Dist. LEXIS 248724 (W.D. Tex. May 8, 2019) (Albright, J.) First, as the Eastern District explains, "[a]ssociational standing is recognized under both" the ADA and the RA, "but only the ADA sets forth a clear statutory definition." *Bernius*, 2016 U.S. Dist. LEXIS 189428 at *10-11. This statutory provision states:

It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

42 U.S.C. § 12182(b)(1)(E). This "ADA provision requires that 'an associated person be actually excluded or denied due to their association.'" *Bernius*, 2016 U.S. Dist. LEXIS 189428 at *11.

Defendant Travis argues that only "certain specified entities" authorized by Congress, such as the Equal Employment Opportunity Commission, may bring third-party actions under the ADA. (Doc. 90-1 at 14.) Defendants Kent, O'Quin, Williams, and EFPPJ argue that Harmony does not have either direct or third-party standing to bring an ADA claim, disputing Plaintiff's claim to associational standing. (Doc. 88-1 at 12–13.)

As Defendants Kent, O'Quin, Williams, and EFPPJ note, the Fifth Circuit has declined to "explicitly recognize[] a cause of action for discrimination based on association with a handicapped person." *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 886 (5th Cir. 2020) (unpublished) (quoting *Spencer v. FEI, Inc.*, 725 F. App'x 263, 267 (5th Cir. 2018) (unpublished) (per curiam)). However, every Fifth Circuit opinion stating that the court has not recognized such a cause of action is unpublished. *Besser*, 834 F. App'x 876; *Spencer*, 725 F. App'x 263; *Gomez v. Off. Ally, Inc.*, 796 F. App'x 224 (5th Cir. 2020) (unpublished); *Grimes v. Wal-Mart Stores Tex., L.L.C.*, 505 F. App'x 376, 380 n.1 (5th Cir. 2013) (unpublished). Furthermore, each is limited to Title I of the ADA, which specifically prohibits discrimination on the basis of disability in the employment context. 42 U.S.C. §§ 12111–12117. *See Besser*, 834 F. App'x 876; *Spencer*, 725 F. App'x 263; *Gomez*, 796 F. App'x 224; *Grimes*, 505 F. App'x 376. Plaintiffs here allege a violation of Title II of the ADA, which prohibits discrimination on the basis of disability in public services. 42 U.S.C. § 12131-12165. The Fifth Circuit has not addressed any claims of associational standing in Title II cases. Each of the Title I cases it has addressed has proceeded to analyze the claim of

28

associational standing as though such a cause of action is recognized in the Fifth Circuit. *Besser*, 834 F. App'x at 886; *Spencer*, 724 F. App'x at 267; *Gomez*, 796 F. App'x at 225; *Grimes*, 505 F. App'x at 380.

The vast majority of other federal appellate courts have explicitly found an ADA cause of action for associational discrimination in the Title I and Title II contexts. *See, e.g.*, *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016) (Title I); *Dodson v. Coatesville Hosp. Corp.*, 773 F. App'x 78, 83 (3d Cir. 2019) (Title I); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 308 n.11 (3d Cir. 2007) (Title II); *A Helping Hand, LLC v. Balt. Cty.*, 515 F.3d 356, 362-64 (4th Cir. 2008) (Title II); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332-35 (6th Cir. 2002) (Title II); *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1019 (7th Cir. 2016) (Title II); *SoCal Recovery, Ltd. Liab. Co. v. City of Costa Mesa*, 56 F.4th 802, 812 (9th Cir. 2023) (Title II); *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1082 (10th Cir. 1997) (Title I); *McCullum v. Orlando Reg'l Healthcare Sys.*, 768 F.3d 1135 (11th Cir. 2014) (Title II). While the exact standards or tests may vary from circuit to circuit, the recognition of associational standing under the ADA is widespread and supported by the statutory text. *See* 42 U.S.C. § 12182(b)(1)(E).

Associational standing under the RA, however, is more complicated. As the Eastern District notes, "[c]ourts generally agree that under the Rehabilitation Act, 'non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person.'" *Bernius*, 2016 U.S. Dist. LEXIS 189428 at *10. The scope of this standing is debated. While 29 U.S.C. § 794a(a)(2) "makes a remedy 'available to *any person aggrieved* by any act or failure to act by any' entity subject to the Rehabilitation Act," this "is set within a larger statutory context." *Id.* at 11. (quoting 29 U.S.C. § 794a(a)(2)). The provision of the RA that prohibits discrimination, § 794(a), states that "[n]o otherwise qualified individual with a disability

in the United States… shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" subject to the RA. 29 U.S.C. § 794(a).

As the Eastern District explained in *Bernius*, "two federal circuits have come to different conclusions about the type of injury a non-disabled Rehabilitation Act claimant must experience." *Bernius*, 2016 U.S. Dist. LEXIS 189428 at *10. Under the Second Circuit's interpretation, "a non-disabled person need not suffer an 'exclusion from the participation in, denial of the benefits of, or subjection to discrimination' in order to have associational standing." *Id.* at *13 (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 280 (2d Cir. 2009)). Rather, such "a non-disabled plaintiff only must establish 'an injury causally related to, but separate and distinct from, a disabled person's injury under'" the RA. *Id.* (quoting *Loeffler*, 582 F.3d at 280). On the other hand, the Eleventh Circuit held that the statutory context limited the scope of § 794a(a)(2), such that "non-disabled plaintiffs only have associational standing under the Rehabilitation Act when 'they allege that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person.'" *Id.* at *14 (quoting *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1143 (11th Cir. 2014)). The Eastern District found this latter interpretation to be most consistent with the ADA standard for associational standing. *Id.* at *15. It adopted the Eleventh Circuit's "more narrow definition of associational standing" for RA claims, as have district courts in the Middle District of Louisiana and in the Western District of Texas. *See Labouliere v. Our Lady of the Lake Found.*, No. 16-00785-JJB-EWD, 2017 U.S. Dist. LEXIS 160853, 2017 WL 4365989 (M.D. La. Sep. 29, 2017) (Brady, J.); *Brown v. McLane Child.'s Scott*, No. W-19-CV-00045-ADA, 2018 U.S. Dist. LEXIS

248724, 2019 WL 13253791 (W.D. Tex. May 8, 2019) (Albright, J.). This Court likewise adopts the interpretation consistent with the ADA standard.

Even the court in *Arce v. Louisiana*, which declined to explicitly adopt either interpretation, found that "[e]ven the narrowest constructions" of the RA associational standing provision "leave non-disabled individuals with room to bring associational discrimination claims in certain circumstances." *Arce v. Louisiana*, 306 F. Supp. 3d 897, 917 (E.D. La. 2017) (Africk, J.) (collecting cases). The Court finds that this is a circumstance in which associational standing is appropriate.

Defendants here argue that Plaintiff Harmony lacks any standing under the ADA or RA to bring a claim of discrimination. (Doc. 88-1 at 11–13; Doc. 90-1 at 12–14.) They argue that Plaintiff cannot bring a suit on its own behalf because it is not a disabled person, and it cannot bring a suit on behalf of the disabled NGBRI and NCST individuals. (Doc. 88-1 at 12; Doc. 90-1 at 13–14.) Defendants misunderstand both Plaintiff's claims and the standing requirements for ADA and RA claims.

First, Plaintiff does not claim to sue on behalf of the NGBRI and NCST patients; rather, it explicitly states that it brings this suit "on its own behalf for injury it suffers itself due to its association with ADA-protected persons (NGBRI and NCST patients)." (Doc. 84-1 at ¶ 237.) Second, to bring such a claim premised on association with disabled persons, Plaintiff does not need to show that it is also a disabled person. Instead, as the Eastern District explained, "the ADA's associational standing provision requires the non-disabled individual to be 'excluded or otherwise denied equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities' because of her association with a disabled person." *Bernius*, 2016 U.S. Dist. LEXIS 189428 at *14-15 (quoting 42 U.S.C. § 12182(b)(1)(E)) (cleaned up). Likewise, the Court interprets the RA to require a plaintiff to allege that they have been "personally excluded,

personally denied benefits, or personally discriminated against because of their association with a disabled person." *Id.* at \*14 (quoting *McCullum*, 768 F.3d at 1143).

Plaintiff alleges that it, an entity provided for in § 12182(b)(1)(E), was denied a permit because of its association with disabled persons, the NGBRI and NCST patients. It alleges that Defendant Travis stated that "it would be wonderful if inmates of the forensic facility [NGBRI and NCST patients] would not be in a residential area." (Doc. 84-1 at ¶ 162.) It alleges that Defendant Kent stated that "the kind of people that [Plaintiff] wants to put in Grace will never happen in the Parish." (*Id.* at ¶ 165) Plaintiff claims that none of alleged deficiencies in its application for the permit were supported by law. (Doc. 84-1 at ¶¶ 169–203.) Instead, it claims that these deficiencies were mere pretext for the alleged discrimination, as part of an ongoing effort to "delay the efforts of Harmony to comply with the obligations in the CEA in having the Property ready to receive the first [NGBRI and NCST] patients," resulting in the termination of the CEA. (Doc. 84-1 at ¶ 203.) Specifically, Plaintiff points to the difference in treatment between the prior owner of the property, who was allowed to operate a nursing home and hospital for decades, and Harmony, which was not granted a permit to do renovations to operate a similar home for NGBRI and NCST patients. (*Id.* at ¶ 28–33, 168, 189, 208.) Absent a Fifth Circuit case on point, the Court looks to *MX Grp., Inc. v. City of Covington*, where the Sixth Circuit upheld the district court's finding that a methadone clinic had standing to sue on its own behalf for discrimination under the ADA and RA after it "presented evidence that it was denied a zoning permit because it cares for and/or associates with individuals who have disabilities." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002). Plaintiff here presents sufficient facts to allege that it has been discriminated against due to its association with disabled persons, and it therefore has standing under the ADA and RA.

ii.    **Plaintiff Pleads Facts Sufficient to State an ADA and RA Claim**

Defendants Kent, O'Quin, Williams, and EFPPJ challenge Plaintiff's RA claim not only on standing grounds but also as a matter of law. They argue that Plaintiff has not sufficiently alleged "that its association with allegedly disabled inmates was a determining factor in the denial of its building permit, let alone the sole factor." (Doc. 88-1 at 13.) Plaintiff argues that it has alleged sufficient facts to plead an RA claim. (Doc. 92 at 18, 23.) At the 12(b)(6) stage, Plaintiff need only present sufficient allegations to state a claim to relief that is plausible on its face, that is, "to raise a reasonable hope or expectation … that discovery will reveal relevant evidence of each element of a claim." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)).

Plaintiff claims that the alleged deficiencies the EFP Defendants relied on in denying its permit application were pretextual. It states that EFP Defendants presented seven alleged deficiencies, which Plaintiff's counsel refuted to the EFP District Attorney. (Doc. 84-1 at ¶ 169.) Plaintiff supports its claims with arguments that each of these alleged deficiencies was either pretextual, remedied immediately, or both.

First, and most importantly, Plaintiff claims that EFP Defendants stated that the property was not correctly zoned and could not be "grandfathered" in. (Doc. 84-1 at ¶¶ 168, 185, 196.) Plaintiff presents evidence that at the time the property was purchased and as of February 27, 2023, the property was in an unincorporated area of EFP that was "not regulated nor restricted by any zoning ordinance or classification that is effective in EFP." (Doc. 59-2 at ¶ 10(j)). It presents further evidence that "as of the date of the adoption of the EFP Planning and Zoning Ordinance, the Property was in active use as a skilled nursing center." (*Id.* at ¶ 10(k)). Plaintiff claims that there

are no Louisiana statutes or EFP municipal ordinances that prevent the Property from being grandfathered in. (Doc. 84-1 at ¶¶ 198–201.)

Second, Plaintiff claims that EFP Defendants stated that an applicant for a permit "must be a Commercial General Contractor or owner depending on the value of the job" and as per state law, must be "a general contractor for projects with a value of $50,000 or more." (*Id.* at ¶¶ 168, 181.) Plaintiff claims that no such requirement exists in either Louisiana statute or the EFP municipal code; that both the owner (Harmony Behavioral Health Services, LLC) and the contractor (Collis Temple Contractors, Inc.) are listed on the application under "owner" and "contractor" respectively; and that "Collis Temple Contractors, Inc. is a general contractor, legally licensed by the Louisiana Contractor's Licensing Board." (*Id.* at ¶¶ 180–84.)

Third, Plaintiff claims that EFP Defendants stated that "[t]he contractor must be registered with the Parish: this was implemented January of 2024 and has not yet been uploaded to the website." (*Id.* at ¶ 168.) Plaintiff argues that such registration is preempted by state law, which requires licensing with the Louisiana Contractor's Licensing Board; in the alternative, it points out that such a requirement "is not noted on the EFP website, nor has it been promulgated to the public in any official journal or otherwise, as required by law." (*Id.* at ¶ 178–79.)

Fourth, Plaintiff claims that EFP Defendants stated "[a]ll descriptions, scopes of work, construction plans needed trades must match." (*Id.* at ¶ 168.) Plaintiff argues that the "EFP Building Department did not, and cannot specify anything in the plans that do not 'match'" and that this alleged deficiency is insufficient. (*Id.* at ¶ 176.)

Fifth, Plaintiff claims that EFP Defendants stated the application "[m]ust have a complete copy of Cash Sale; the one provided is missing the lower portion of every page." (*Id.* at ¶ 168.) Plaintiff states that Building Department records reflect the "Act of Cash Sale received 3/9/23 at

2:40 p.m." (*Id.* at ¶ 166.) Plaintiff responded to the list of alleged deficiencies by "provid[ing] a pdf scan of the complete Cash Sale wherein Harmony purchased the Property, attached to the reply email." (*Id.* at ¶ 175.)

Sixth, Plaintiff claims that EFP Defendants stated the application "[m]ust have a legal survey map" rather than simply the Tax Assessor information. (*Id.* at ¶ 168.) Plaintiff argues that the map it provided was sufficient and that EFP Defendants' request was an "attempt by EFP to require the filing of a new survey plat containing a zoning note" necessitating new zoning. (*Id.* at ¶ 171.)

Finally, Plaintiff claims that EFP Defendants stated the "minimum number of required patient rooms for lease must match plans—current plans show 39 single occupancy patient rooms" and stating that if the number of rooms were to be changed, then those "plans will have to be approved by both LDH and the State Fire Marshal before the sale of a permit." (*Id.* at ¶ 168.) Plaintiff argues that this "is a thinly veiled attempt . . . to tie Harmony's building permit to the LOI." (*Id.* at ¶ 170.) It argues further that there is no requirement stated anywhere about the number of rooms matching on any documents. (*Id.*) Plaintiff argues that these alleged deficiencies, which it claims were not based in either law or fact, were merely pretext for EFP Defendants' bias against the NGBRI and NCST patients. (*Id.* at ¶¶ 169–203, 211–12, 238.)

Plaintiff presents evidence that Defendants Travis, Kent, and Williams made comments explicitly opposed to the presence of the NGBRI and NCST patients in EFP. Defendant Travis allegedly stated "that it would be wonderful if inmates of the forensic facility [NGBRI and NCST patients] would not be in a residential area," that he was "not in support of it… as the sheriff of the East Feliciana Parish," that he was "not for it," and that he was "going to do everything [he] can to see that this doesn't happen." (Doc. 84-1 at ¶¶ 70–71, 162.) Defendant Kent allegedly said in a

March 6, 2023, meeting of the EFPPJ "that no facility to house mentally disabled individuals could be renovated until the property was rezoned." (*Id.* at ¶ 93.) He also allegedly said at a public information meeting on May 10, 2023, that "the kind of people that [Plaintiff] wants to put in Grace will never happen in the Parish." (*Id.* at ¶ 165.) Plaintiff alleges that Defendant Williams stated at the March 6, 2023, EFPPJ meeting that if the renovations were made to the Property, "[t]hat in his 'book that is an institution.'" (*Id.* at ¶ 67). Plaintiff further alleges that at this meeting, Williams "had personally assured the EFP Police Jury that the Building Department would not issue a permit to Harmony." (*Id.* at ¶ 94.) The permit application was not filed until March 9. (*Id.* at ¶ 78.)

In support of its claims, Plaintiff presents allegations as to Defendants' statements opposed to the presence of NGBRI and NCST patients in EFP, as well as evidence of the alleged inadequacy of the deficiencies Defendants stated in the permit application. However, Plaintiff does not allege any such statements on the part of Defendant O'Quin. Given these facts, Plaintiff pleads sufficient facts to state a claim for relief under the Rehabilitation Act that is plausible on its face against Defendants Kent, Williams, Travis, and EFPPJ, but not Defendant O'Quin.

## Conclusion

Accordingly, Defendants EFPPJ, Kent, O'Quin, and Williams' *12(B)(1) and 12(B)(6) Motion to Dismiss* (Doc. 88) is GRANTED IN PART and DENIED IN PART, and Defendant Travis's *12(B)(1) and 12(B)(6) Motion to Dismiss* (Doc. 90) is GRANTED IN PART and DENIED IN PART. Specifically, all Defendants' motions to dismiss pursuant to 12(b)(1) are GRANTED with respect to the takings claim. Plaintiff's takings claim is DISMISSED WITHOUT PREJUDICE. All Defendants' motions to dismiss pursuant to 12(b)(1) are DENIED with respect to standing and redundancy. All Defendants' motions to dismiss pursuant to 12(b)(6) are DENIED

with respect to the substantive due process claims. Defendant Travis's motion to dismiss pursuant to 12(b)(6) is GRANTED with respect to the procedural due process claim. Finally, Defendants EFPPJ, Kent, Williams, and Travis' motions to dismiss pursuant to 12(b)(6) are DENIED with respect to the Rehabilitation Act claim. Defendant O'Quin's motion to dismiss pursuant to 12(b)(6) is GRANTED with respect to the Rehabilitation Act claim; Plaintiff's Rehabilitation Act claim against Defendant O'Quin is DISMISSED WITHOUT PREJUDICE.

Plaintiff is given leave to amend with respect to the takings claim and Rehabilitation Act claim. Any amendments are due 28 days from order. Failure to amend will result in dismissal of claims with prejudice. Defendants are instructed to contact the Court if the 28-day period passes and Plaintiff has failed to file any amended complaint.

Signed in Baton Rouge, Louisiana, on <u>September 26, 2024</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**